# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
### NEW ALBANY DIVISION

| | | |
|---|---|---|
| LINDA K. RODDY | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 4:11-cv-23-TWP-WGH |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of the | ) | |
| Social Security Administration, | ) | |
| | ) | |
| Defendant. | ) | |

## ENTRY ON JUDICIAL REVIEW

Plaintiff, Linda K. Roddy ("Roddy"), requests judicial review of the decision of Defendant, Michael J. Astrue, Commissioner of Social Security Administration ("the Commissioner"), denying Roddy's application for Disability Insurance Benefits ("DIB"). For the reasons set forth below, the Commissioner's decision is **AFFIRMED**.

## I. BACKGROUND

### A.    PROCEDURAL HISTORY

On December 12, 2007, Roddy filed an application for DIB, alleging that she became disabled on November 15, 2005. Her application was denied initially on April 25, 2008 and upon reconsideration on November 10, 2008. On March 2, 2010, Roddy appeared with counsel and testified at a video hearing before Administrative Law Judge Sridhar Boini (the "ALJ"). On April 15, 2010, the ALJ issued his decision finding that Roddy was not disabled. On January 4, 2011, the Appeals Council denied review of the ALJ's decision. The ALJ's decision is therefore the final decision of the Commissioner for purposes of judicial review.

B.     MEDICAL HISTORY

Roddy was 41 years old on her alleged onset date of November 15, 2005.  (R. at 22.)  She has a high school education.  (R. at 22.)  Roddy was previously employed as a fast food shift manager.  (R. at 22.)

Following a car accident on February 23, 1999, Roddy went to the emergency room with complaints of neck, forehead, shoulder, and back pain.  (R. at 380.)

Roddy was referred to pain management specialist Gary Wright, M.D. ("Dr. Wright").  (R. at 194; R. at 583.)  Dr. Wright first saw Roddy on November 19, 1999.  (R. at 582-88.)  At the first appointment, Roddy described low back pain, neck pain, mid-back pain, and headaches.  (R. at 583.)

Dr. Wright continued to treat Roddy from 1999 until Roddy's alleged onset date of November 15, 2005.  Dr. Wright administered nerve blocks throughout this time period on Roddy's bilateral sacroiliac joint while also performing L 3-4, L4-5 and L5-S1 facet nerve blocks.  (*See, e.g.*, R at 307-08, 310-11, 314-15, 316-17, 327-28, 405-06, 408-09, 424-25, 427-28, 434-35, 437-38, 463-64, 469-70, 475-76, 541, 563, 557.)  Roddy has reported varying degrees of relief from her symptoms after these nerve blocks.  She has reported good relief for only about three days.  (R. at 554.)  She has, however, also referred to the nerve blocks as helping "significantly."  (R. at 541.)  On August 3, 2000, Peter Furno, D.C., of Dr. Wright's office wrote that Roddy had shown "varying degrees of improvement but, unfortunately, the nature of the patient's work duties appear to be an exacerbative factor in the refractory nature of her condition."  (R. at 520.)  Roddy said that work restrictions were being ignored when things got busy at Taco Bell and that working beyond her restrictions made her symptoms worse.  (R. at 520.)  After seeing Roddy on January 18, 2002, Dr. Wright noted that Roddy had several months

of relief following lumbar facet blocks, but that her low back pain had eventually returned.  (R. at 440.)

During this time period, Roddy also underwent some physical therapy.  (R. at 534, 547.) In addition to nerve blocks and physical therapy, Roddy was initially using Methadone, Neurontin, and Celebrex for pain (R. at 502-03), which Roddy reported reduced but did not eliminate her pain.  (R. at 500.)  Eventually, after Roddy reported feeling "spacy" on Methadone, she was switched to OxyContin and Oxycodone.  (R. at 441.)

An August 24, 2000, MRI of the lumbar spine showed, at L5-S1, "moderate dehydration … mild to moderate right-sided facet degeneration and mild posterior annular fissuring and annular bulging without herniation or Sl nerve compression."  (R. at 273.)   The MRI was otherwise unremarkable with no significant nerve compression identified.  (R. at 273.)  An MRI of the lumbar spine taken on October 11, 2003, was essentially unchanged from the August 24, 2000, MRI.  (R. at 277.)

On January 3, 2001, Dr. Wright noted that discography was positive with concordant pain at the L5-S1 level.  (R. at 495.)

On June 27, 2002, Dr. Wright limited Roddy to lifting no more than ten pounds and working no more than six hours a day five days a week.  (R. at 423.)

On September 8, 2003, Roddy reported to Dr. Wright that she had lost all of her health benefits and did not have the financial means to pay for any prescriptions or procedures.  (R. at 285.)

On October 12, 2005, Dr. Wright found that Roddy was "markedly tender" over the erector spinae and sternoclavicular insertions.  (R. at 290.)  Roddy's neck and back ranges of

motion were reportedly limited secondary to pain and spasm.  Roddy was "very tender" over the cervical and lumbar facets and the sacroiliac joints.  (R. at 290.)

On November 14, 2005, Dr. Wright wrote that Roddy's ambulation was "hesitant." (R. at 292.)  He explained that Roddy was "exquisitely tender" over bilateral sacroiliac joints and lumbar facets at L3-4 and L4-5.  (R. at 292.)  He provided bilateral sacroiliac joint nerve blocks. (R. at 293.)  He added that Roddy "has intractable low back and radicular pain in spite of aggressive physical medicine treatment and pharmacological management."  (R. at 293.)

On November 23, 2005, Dr. Wright injected Roddy's bilateral facet joints at L3-4, L4-5, and L5-S1.  (R. at 297-98.)

Roddy told Dr. Wright on January 4, 2006, that she had complete pain relief from the nerve blocks for four weeks, but added that the pain had returned over the previous two weeks. (R. at 303.)

In connection with the Social Security claim, consulting internal medicine physician Larissa Dimitrov, M.D. ("Dr. Dimitrov"), examined Roddy on January 19, 2008.  (R. at 335-39.) Her examination findings were essentially normal.  Roddy indicated to Dr. Dimitrov that she had obtained a half million dollar settlement as a result of the injuries she sustained in the 1999 car accident.  (R. at 335.)  Roddy reported being able to sweep, mop, cook, do dishes, do laundry, and shop, but that these chores took long intervals to do.  She also reported mowing the lawn on a riding lawn mower.  (R. at 335.)  Roddy denied taking any current medications.  (R. at 336.) Roddy was able to get out of a chair and on to the exam table without difficulty.  (R. at 336.) Roddy had a normal gait, a minimal reduction in range of motion of her spine, and a negative straight leg test.  (R. at 337.)  Dr. Dimitrov noted that it was significant that Roddy continued to work for six to seven years after her car accident.  (R. at 338.)

State agency physician B. Whitley, M.D. ("Dr. Whitley"), evaluated Roddy's claim on February 11, 2008, and concluded that the medical evidence does not support any severe physical impairment. (R. at 340.) Dr. Whitley's evaluation was affirmed by state agency physician J.V. Corcoran, M.D., on November 6, 2008. (R. at 366.)

## II. DISABILITY AND STANDARD OF REVIEW

To be eligible for SSI and DIB, a claimant must have a disability under 42 U.S.C. § 423. "Disability" means the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment that has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 423(d)(1)(A). In determining whether a claimant is disabled, an ALJ applies a five-step process set forth in 20 C.F.R. § 404.1520(a)(4):

1. If the claimant is employed in substantial gainful activity, the claimant is not disabled.

2. If the claimant does not have a severe medically determinable physical or mental impairment or combination of impairments that meets the duration requirement, the claimant is not disabled.

3. If the claimant has an impairment that meets or is equal to an impairment listed in the appendix to this section and satisfies the duration requirement, the claimant is disabled.

4. If the claimant can still perform the claimant's past relevant work given the claimant's residual functional capacity, the claimant is not disabled.

5. If the claimant can perform other work given the claimant's residual functional capacity, age, education, and experience, the claimant is not disabled.

The burden of proof is on the claimant for the first four steps; it then shifts to the Commissioner at the fifth step. *Young v. Sec'y of Health & Human Servs.*, 957 F.2d 386, 389 (7th Cir. 1992).

The Social Security Act, specifically 42 U.S.C. § 405(g), provides for judicial review of the Commissioner's denial of benefits.  When the Appeals Council denies review of the ALJ's findings, the ALJ's findings become the findings of the Commissioner.  *See, e.g., Henderson v. Apfel*, 179 F.3d 507, 512 (7th Cir. 1999).  This Court will sustain the ALJ's findings if they are supported by substantial evidence.  42 U.S.C. § 405(g); *Nelson v. Apfel*, 131 F.3d 1228, 1234 (7th Cir. 1999).  In reviewing the ALJ's findings, the Court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the ALJ.  *Id*.  While a scintilla of evidence is insufficient to support the ALJ's findings, the only evidence required is "such evidence as a reasonable mind might accept as adequate to support a conclusion."  *Diaz v. Chater*, 55 F.3d 300, 305 (7th Cir. 1995) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

The ALJ "need not evaluate in writing every piece of testimony and evidence submitted."  *Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993).  However, the "ALJ's decision must be based upon consideration of all the relevant evidence."  *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994).  Further, "[a]n ALJ may not discuss only that evidence that favors his ultimate conclusion, but must articulate, at some minimum level, his analysis of the evidence to allow the [Court] to trace the path of his reasoning."  *Diaz*, 55 F.3d at 307.  An ALJ's articulation of his analysis "aids [the Court] in [its] review of whether the ALJ's decision was supported by substantial evidence."  *Scott v. Heckler*, 768 F.2d 172, 179 (7th Cir. 1985).

## III.  DISCUSSION

### A.   THE ALJ'S FINDINGS

In his decision, the ALJ determined that Roddy met the disability insured status requirements of the Social Security Act through December 31, 2009, and that Roddy had not

engaged in substantial gainful activity since her alleged onset date of November 15, 2005.  (R. at 16.)  The ALJ found that Roddy had degenerative disc disease, disorders of the back, upper extremity pain post left wrist triangular fibrocartilage complex tear and cubital tunnel syndrome, headaches, and hip pain.  (R. at 16.)  The ALJ further found these impairments were severe as defined under the Social Security Act and had caused more than a minimal effect on Roddy's ability to perform basic work activities.  (R. at 17.)  The ALJ concluded, however, that Roddy's impairments did not meet or medically equal Listings 1.00 or any other impairment found in the regulations' Listing of Impairments.  (R. at 18.)

The ALJ determined Roddy had the residual functional capacity ("RFC") to perform sedentary work consistent with the following capabilities: lifting and carrying ten pounds occasionally and five pounds frequently; standing/walking for up to two hours in an eight-hour workday with sitting for at least six hours; alternating between sitting and standing more frequently than customary breaks and lunch; occasionally pushing, pulling, and overhead lifting with the non-dominant upper extremity;  never climb ropes, ladders, scaffolds, ramps or stairs; only occasionally, stoop, kneel, crouch, or crawl; and avoid occupations that require continuous ambulation over uneven surfaces.  (R. at 18.)  In making the above determinations, the ALJ found that Roddy's statements regarding the intensity, persistence, and limiting effects of her symptoms were not credible to the extent that they were inconsistent with the RFC assessment.  (R. at 20.)  Although the impairments could reasonably be expected to cause Roddy's symptoms, the ALJ determined the medical record did not establish an inability to sustain all work because of these limitations.  (R. at 21.)  The ALJ then determined Roddy was unable to perform her past relevant work.  (R. at 22.)    Nonetheless, based on his RFC assessment, the ALJ found that

Roddy could perform sedentary jobs that exist in significant numbers in the national economy. (R. at 23.)

**B.    RODDY'S ARGUMENTS ON APPEAL**

    **1.    <u>Omission of Dr. Wright's Opinions</u>**

Roddy's first argument is that the ALJ erred when he declined to give greater weight to the opinions of Dr. Wright. Opinions of a treating physician are generally entitled to controlling weight. *Clifford v. Apfel,* 227 F.3d 863, 870 (7th Cir. 2000). However, an ALJ may reject the opinion of a treating physician if it is based on a claimant's exaggerated subjective allegations, is internally inconsistent, or is inconsistent with other medical evidence in the record. *Dixon v. Massanari,* 270 F.3d 1171, 1177-78 (7th Cir. 2001). Furthermore, 20 C.F.R. § 404.1527 provides guidance for how the opinions of treating and nontreating sources are to be evaluated and explains as follows:

> (d)  How we weigh medical opinions. Regardless of its source, we will evaluate every medical opinion we receive. Unless we give a treating source's opinion controlling weight under paragraph (d)(2) of this section, we consider all of the following factors in deciding the weight we give to any medical opinion.
>
> (1)  Examining relationship. Generally, we give more weight to the opinion of a source who has examined you than to the opinion of a source who has not examined you.
>
> (2)  Treatment relationship. Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight. When we do not give the treating source's opinion controlling weight, we apply the factors

listed in paragraphs (d)(2)(i) and (d)(2)(ii) of this section, as well as the factors in paragraphs (d)(3) through (d)(6) of this section in determining the weight to give the opinion. We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion.

(i) Length of the treatment relationship and the frequency of examination. Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the source's medical opinion. When the treating source has seen you a number of times and long enough to have obtained a longitudinal picture of your impairment, we will give the source's opinion more weight than we would give it if it were from a nontreating source.

(ii) Nature and extent of the treatment relationship. Generally, the more knowledge a treating source has about your impairment(s) the more weight we will give to the source's medical opinion. We will look at the treatment the source has provided and at the kinds and extent of examinations and testing the source has performed or ordered from specialists and independent laboratories. For example, if your ophthalmologist notices that you have complained of neck pain during your eye examinations, we will consider his or her opinion with respect to your neck pain, but we will give it less weight than that of another physician who has treated you for the neck pain. When the treating source has reasonable knowledge of your impairment(s), we will give the source's opinion more weight than we would give it if it were from a nontreating source.

(3) Supportability. The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion. The better an explanation a source provides for an opinion, the more weight we will give that opinion. Furthermore, because nonexamining sources have no examining or treating relationship with you, the weight we will give their opinions will depend on the degree to which they provide supporting explanations for their opinions. We will evaluate the degree to which these opinions consider all of the pertinent evidence in your claim, including opinions of treating and other examining sources.

(4) Consistency. Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion.

(5) Specialization. We generally give more weight to the opinion of a

specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist.

(6)   Other factors.   When we consider how much weight to give to a medical opinion, we will also consider any factors you or others bring to our attention, or of which we are aware, which tend to support or contradict the opinion.  For example, the amount of understanding of our disability programs and their evidentiary requirements that an acceptable medical source has, regardless of the source of that understanding, and the extent to which an acceptable medical source is familiar with the other information in your case record are relevant factors that we will consider in deciding the weight to give to a medical opinion.

20 C.F.R. § 404.1527.

Here, Roddy asserts that the ALJ committed reversible error when he failed to address Dr. Wright's opinion from June 27, 2002, that Roddy was limited to lifting no more than ten pounds and working no more than six hours a day five days a week.  (R. at 423.)  The ALJ's failure to address this opinion was not reversible error for several reasons.  First, and foremost, Dr. Wright rendered this opinion more than three years prior to Roddy's alleged onset date of November 15, 2005.   The opinion does not concern the relevant time period after Roddy's alleged onset date.  Additionally, the evidence reveals that Roddy never actually adhered to these restrictions for the entire three-plus year period after Dr. Wright rendered this opinion.  Roddy worked at Taco Bell at a level greater than these restrictions, so her activity level was clearly inconsistent with Dr. Wright's opinion.[1]  Finally, the ALJ was free to reject this opinion because it was inconsistent with the other evidence in the record during the relevant time period after Roddy's alleged onset date.  Dr. Dimitrov examined Roddy on January 19, 2008, and found essentially normal results.  (R. at 335-39.)   Because Dr. Wright's opinions about Roddy's

---

[1]In her Reply Brief, Plaintiff argues that reliance on Plaintiff's work between 2002 and 2005 is a "post hoc" argument.  (*See* Reply Brief at 2.)  However, we believe that the ALJ did articulate this fact in the decision.  (R. at 21) ("Surprisingly, the Claimant maintained at hearing that the injections and blocks were not helpful *despite her work activity during the time of the treatment*.  (Exhibit 2F)" (emphasis added)).

abilities were rendered well before the alleged onset date, were inconsistent with Roddy's actual activity level, and were inconsistent with substantial medical evidence during the relevant time period after Roddy's alleged onset date, the ALJ did not err by failing to address Dr. Wright's opinions from June 12, 2002.   The ALJ's decision is, therefore, supported by substantial evidence and must be AFFIRMED.

### 2.    The ALJ's Credibility Determination

Roddy also found fault with the ALJ's credibility determination because, according to Roddy, the ALJ; 1) improperly addressed Roddy's failure to seek medical treatment; 2) misstated Roddy's ability to cope through use of over-the-counter medications; 3) mischaracterized Roddy's testimony about the effectiveness of nerve blocks; and 4) improperly relied too heavily on Roddy's activities of daily living.

The ALJ's decision regarding a witness's credibility will not be overturned unless it is "patently wrong," because the ALJ "is in the best position to determine a witness's truthfulness and forthrightness."  *Skarbeck v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004). However, "errors of fact or logic" will override this deference.  *Allord v. Barnhart*, 455 F. 3d 818, 821 (7th Cir. 2006).  Here, the ALJ's "credibility" decision is not only an analysis of Roddy's credibility, but also an evaluation of Roddy's complaints of pain.  Therefore, the ALJ must consider SSR 96-7p, the regulation promulgated by the Commissioner to assess and report credibility issues, as well as 20 C.F.R. § 404.1529(c)(3).

SSR 96-7p states that there is a two-step process that the ALJ engages in when determining an individual's credibility:

> First, the adjudicator must consider whether there is an underlying medically determinable physical or mental impairment(s)--i.e., an impairment(s) that can be shown by medically acceptable clinical and laboratory diagnostic techniques--that

could reasonably be expected to produce the individual's pain or other symptoms. The finding that an individual's impairment(s) could reasonably be expected to produce the individual's pain or other symptoms does not involve a determination as to the intensity, persistence, or functionally limiting effects of the individual's symptoms.   If there is no medically determinable physical or mental impairment(s), or if there is a medically determinable physical or mental impairment(s) but the impairment(s) could not reasonably be expected to produce the individual's pain or other symptoms, the symptoms cannot be found to affect the individual's ability to do basic work activities.

Second, once an underlying physical or mental impairment(s) that could reasonably be expected to produce the individual's pain or other symptoms has been shown, the adjudicator must evaluate the intensity, persistence, and limiting effects of the individual's symptoms to determine the extent to which the symptoms limit the individual's ability to do basic work activities.   For this purpose, whenever the individual's statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, *the adjudicator must make a finding on the credibility of the individual's statements based on a consideration of the entire case record. This includes the medical signs and laboratory findings, the individual's own statements about the symptoms, any statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and any other relevant evidence in the case record.*   This requirement for a finding on the credibility of the individual's statements about symptoms and their effects is reflected in 20 CFR 404.1529(c)(4) and 416.929(c)(4).   These provisions of the regulations provide that an individual's symptoms, including pain, will be determined to diminish the individual's capacity for basic work activities to the extent that the individual's alleged functional limitations and restrictions due to symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence in the case record.

SSR 96-7p (emphasis added; footnote omitted). SSR 96-7p further provides that the ALJ's

decision regarding the claimant's credibility "must contain specific reasons for the finding on

credibility, supported by the evidence in the case record, and must be sufficiently specific to

make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to

the individual's statements and the reasons for that weight." *Id*.

Moreover, 20 C.F.R. § 404.1529(c)(3) states that when a claimant's subjective individual

symptoms, such as pain, are considered, several factors are relevant including:  (1) the individual's

daily activities; (2) the location, duration, frequency, and intensity of the individual's pain or other symptoms; (3) factors that precipitate and aggravate the symptoms; (4) the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; (6) any measures other than treatment the individual uses or has used to relieve pain or other symptoms; and (7) any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.   20 C.F.R. § 404.1529(c)(3)(i)-(vii).

In this instance, the ALJ conducted a very thorough credibility determination.  (R. at 19-22.)  The ALJ gave a great deal of credit to Roddy's testimony about her limitations and limited her to only sedentary work that primarily involved sitting, and that included the ability to switch between a sitting and standing position.  The ALJ made this decision despite essentially normal findings by Dr. Dimitrov.

Roddy's assertion that the ALJ erred by failing to take into consideration her inability to pay for medical treatment is without merit.  The record clearly reflects that Roddy claimed a loss of health insurance and the inability to pay for medical treatment as early as September 8, 2003. (R. at 285.)  However, Roddy was still able to seek significant medical treatment from Dr. Wright well beyond that date.  Furthermore, the medical records reflect that Roddy received a $500,000.00 settlement for the car accident that caused her impairments.  (R. at 335.)  Roddy has not explained why she could not afford medical treatment given such a substantial settlement.  Therefore, Roddy has not carried her burden of demonstrating an inability to pay for medical treatment.  And, the ALJ did not err when he pointed out Roddy's failure to obtain significant medical treatment after her November 15, 2005 alleged onset date.

Next, Roddy claims that the ALJ erred when he found that Roddy could cope with the use of over-the-counter medications.  However, the medical record supports the ALJ's finding.  After Roddy's alleged onset date, medical records reveal that she was only using over the counter medication.  (R. at 336.)  Despite the use of no prescription medications, Dr. Dimitrov found essentially normal exam results and Roddy reported engaging in significant activities of daily living.  (R. at 335-37.)  Consequently, the ALJ's finding that Roddy was coping with only over-the-counter medications was not patently wrong.

As for Roddy's claim that the ALJ erred by misstating how effective Roddy's nerve blocks were, the record does reflect that Roddy testified that the nerve blocks were no longer helping by 2005.  (R. at 43-44.)  However, there are other instances of Plaintiff reporting good relief for three days (R. 554) and as helping "significantly" (R. 541.)   Hence, the ALJ's discussion of Roddy's nerve blocks does not include the type of "error of fact or logic" that would render the credibility determination patently wrong.

Finally, with regard to Roddy's assertion that the ALJ placed too much weight on Roddy's activities of daily living, the court notes that Roddy reported to Dr. Dimitrov that she engaged in significant activities of daily living including being able to sweep, mop, cook, do dishes, do laundry, shop, and mow the lawn on a riding lawn mower.  (R. at 335).   While Roddy reported that these activities took long intervals to do, it is certainly not inconsequential that she was *able* to perform them.  Additionally, Roddy's activities of daily living were only one portion of the ALJ's credibility determination.  In fact, the ALJ determined that Roddy's complaints of disabling pain were not fully credible based on her lack of substantial medical treatment since her alleged onset date, the essentially normal exam results by Dr. Dimitrov, Roddy's use of only over-the-counter pain medications since the alleged onset date, and Roddy's activities of daily living.   This

credibility determination was in compliance with SSR 96-7p and 20 C.F.R. § 404.1529 and certainly was not patently wrong.

## IV.  **CONCLUSION**

The ALJ properly rejected Dr. Wright's opinions rendered prior to Roddy's alleged onset date.  Furthermore, the ALJ's credibility determination was not patently wrong.  The final decision of the Commissioner is, therefore, AFFIRMED.


SO ORDERED.    02/03/2012


Hon. Tanya Walton Pratt, Judge
United States District Court
Southern District of Indiana



DISTRIBUTION:

Thomas E. Kieper
UNITED STATES ATTORNEY'S OFFICE
tom.kieper@usdoj.gov

Timothy J. Vrana
tim@timvrana.com